UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

KLS AIR EXPRESS, INC. dba
FREIGHT SOLUTION PROVIDERS,

        NO. CIV. S-05-2593 FCD DAD

    Plaintiff,

  v.                          MEMORANDUM AND ORDER

CHEETAH TRANSPORTATION LLC,
and DOES 1 through 25,

    Defendants.
_____/
AND RELATED COUNTER AND THIRD-
PARTY ACTIONS.

----oo0oo----

This matter is before the court on a motion for summary judgment brought by defendant Cheetah Transportation, LLC ("defendant" or "Cheetah").[1]  By its motion, defendant seeks adjudication in its favor on plaintiff KLS Air Express, Inc.'s ("plaintiff" or "KLS") complaint, alleging claims for (1) loss or

---

[1] Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. E.D. Cal. L.R. 78-230(h).

damage to freight by motor carrier, pursuant to 49 U.S.C. § 14706 (commonly referred to as the "Carmack Amendment"); (2) negligence; (3) breach of contract; (4) negligent hiring; and (5) declaratory relief.  Plaintiff opposes defendant's motion, arguing triable issues of fact exist as to each of its claims.

For the reasons set forth below, defendant's motion is GRANTED in part and DENIED in part.

## BACKGROUND[2]

In March 2005, KLS contacted Cheetah to arrange for the transportation of a shipment of flat panel monitors ("the shipment") from Jonestown, Pennsylvania to City of Industry, California.  (RUF ¶ 11.)  KLS gave no instructions to Cheetah regarding the transportation of the load of monitors other than the origin and destination points and times and weight of the shipment.  (RUF ¶ 14.)  There was no written agreement for the shipment.  (RUF ¶ 13.)

Cheetah contends that KLS specifically requested that Cheetah arrange for another motor carrier to transport the shipment.  KLS contends, to the contrary, that it requested that Cheetah itself transport the shipment.  (See e.g., RUF ¶ 11.)

KLS also maintains, contrary to Cheetah, that it required and received from Cheetah written proof of insurance evidencing coverage of $250,000.00.  (RUF ¶ 13.)  KLS did not know at the time of the transportation of the goods that Cheetah's insurance

---

[2] Unless otherwise noted, the facts herein are undisputed.  (See Pl.'s Resp. to Stmt. of Undisp. Facts ("RUF"), filed July 12, 2007.)  Where the facts are in dispute, the court recounts plaintiff's version of the facts.  (See id.; Pl.'s Stmt. of Disp. Facts ("DF"), filed July 12, 2007.)

2

1 policy had a $250,000.00 deductible.  (DF ¶ 5.)
2      After receiving KLS's request for the transportation of the
3 monitors, Cheetah contacted Sonko Trucking ("Sonko") to handle
4 the transportation.  (RUF ¶ 17.)  Prior to utilizing Sonko's
5 services, Cheetah entered into a written agreement with Sonko,
6 identifying Cheetah as the broker and Sonko as the carrier,
7 confirmed Sonko's authority to operate as a motor carrier, and
8 obtained a certificate of insurance from Sonko reflecting
9 $100,000.00 in cargo coverage.  (RUF ¶ 18.)  Cheetah sent to
10 Sonko its standard confirmation sheet containing the information
11 that KLS had provided Cheetah about the shipment.  (RUF ¶ 19.)
12 Cheetah contends that from this point Sonko bore the
13 responsibility for picking up the shipment and delivering it in
14 California.  (RUF ¶ 20.)  Cheetah further contends that at no
15 time did it have physical contact with the shipment and, as a
16 broker, was never asked to do so.  (RUF ¶ 21.)  KLS maintains
17 that it dealt only with Cheetah regarding the shipment, that
18 Cheetah, itself, agreed to pick up and deliver the shipment, and
19 it had no knowledge of Sonko's involvement or any contact with
20 Sonko.  (RUF ¶¶ 20-21.)
21      Cheetah asserts that it exercised no control over the manner
22 in which Sonko transported the goods.  (RUF ¶ 23.)  Sonko, in
23 turn, hired Hemi-Express to deliver the shipment.  The entire
24 shipment was stolen on March 21, 2005 while in possession of the
25 Hemi-Express driver.  (RUF ¶ 24.)
26      KLS contends that through the time of the theft, all of its
27 contact was with Cheetah: Cheetah sent KLS e-mails assigning a
28 load number, scheduling the pick up, notifying KLS of the pick

3

1  up, notifying KLS of the theft of the shipment, and notifying KLS
2  of the details of the theft.  (RUF ¶ 23).  KLS subsequently sent
3  Cheetah a written claim for the shipment in the amount of
4  $275,540.00.  (RUF ¶ 25.)  Cheetah denied liability for KLS's
5  claimed loss and submitted the claim to Sonko.  (RUF ¶ 26.)  KLS
6  asserts it would not have done business with Cheetah had KLS
7  known about the $250,000.00 deductible on Cheetah's insurance
8  policy.  (DF ¶s 5-6).

9  Ultimately, KLS and Cheetah disagree whether Cheetah acted
10 as a "broker" or a "motor carrier" for the shipment at issue.
11 Cheetah maintains that it is now, and at all times relevant to
12 this action was, a property broker licensed by the Federal Motor
13 Carrier Safety Administration, and that it has operated as a
14 broker since 2001.  (RUF ¶¶ 2-3.)  Cheetah contends that it
15 served as a broker with respect to the subject shipment.  (RUF ¶
16 6).  Cheetah further asserts that it performed transportation
17 brokerage services for KLS from November 2003 to June 2005,
18 during which time Cheetah only once performed carrier services
19 for KLS.  (RUF ¶ 5.)

20 KLS maintains, on the other hand, that Cheetah performed
21 services as a carrier for KLS with respect to the shipment at
22 issue.  (RUF ¶ 6.)  KLS contends that at all times relevant to
23 the complaint, Cheetah was licensed as a carrier by the Federal
24 Highway Safety Administration (DF ¶ 7); Cheetah advertised itself
25 as a carrier (DF ¶ 8); Cheetah's advertising did not identify
26 Cheetah as a broker (DF ¶ 9); and Cheetah failed to comply with
27 federal law requiring that a broker identify itself as a broker
28 and not a carrier (DF ¶ 10).  Furthermore, KLS contends that

4

Cheetah agreed to transport the subject shipment (DF ¶ 14) and never informed KLS, prior to the shipment's theft, that Cheetah intended to give the load to another carrier (DF ¶ 15). KLS contends that Cheetah never informed it that Cheetah was a transportation broker (DF ¶ 22), and that during prior business dealings, Cheetah provided KLS with multiple bills of lading showing that Cheetah was the carrier (DF ¶ 26).

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); see California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998). The evidence must be viewed in the light most favorable to the nonmoving party. See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000). However, if the nonmoving party has the burden of proof at trial, the moving party only needs to show "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint.  See Nissan Fire & Marine, 210 F.3d at 1107.  Instead, through admissible evidence the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

**ANALYSIS**

**1.   Carmack Amendment**

The Carmack Amendment, 49 U.S.C. § 14706, "subjects common carriers and freight forwarders transporting cargo in interstate commerce to absolute liability for actual loss or injury to property."  Ins. Co. of N. Am. v. NNR Aircargo Serv. (USA), Inc., 201 F.3d 1111, 1115 (9th Cir. 2000) (citing 49 U.S.C. § 14706(a) (West Supp. 1999)).  The statute serves as a shipper's exclusive remedy for damaged property and preempts common law causes of action against such "carriers" and "freight forwarders."  Hughes Aircraft Co. v. North American Van Lines, Inc., 970 F.2d 609, 613 (9th Cir. 1992).

To recover under the Carmack Amendment, the plaintiff does not have to prove negligence; rather, to establish a *prima facie* case under the Amendment, a shipper must prove, by a preponderance of the evidence, that "the goods 1) were delivered to the carrier in good condition, 2) arrived in damaged

6

condition, and 3) resulted in the specified amount of damage [to the plaintiff]." Chubb Group of Insurance Cos v. H.A. Transp. Systems, Inc., 243 F. Supp. 2d 1064, 1068 (C.D. Cal. 2002) (citing Fuente Cigar, Ltd. v. Roadway Express, Inc., 961 F.2d 1558, 1560 (11th Cir. 1992)). Once the plaintiff makes this showing, "the burden shifts to the defendant to show that it was free of negligence and that the damage was caused by one of the several excepted causes that relieve carriers of liability." Id. (citing Indep. Machinery, Inc. v. Kuehne & Nagle, Inc., 867 F. Supp. 752, 758 (N.D. Ill. 1994)).

Particularly significant to this case, the Carmack Amendment's liability scheme distinguishes between "carriers" and "freight forwarders" and "brokers." Only "carriers" and "freight forwarders," not "brokers,"[3] can be liable to the shipper of goods for damages during transit. Id. at 1068-69 (citing Professional Communications, Inc. v. Contract Freighters, Inc., 171 F. Supp. 2d 546, 551 (D. Md. 2001)); Indep. Machinery, 867 F. Supp. at 761; Adelman v. Hub City Los Angeles Terminal, 856 F. Supp. 1544, 1547-48 (N.D. Ala. 1994). While brokers are not

---

[3] Brokers are "middlemen" in the surface transportation industry "who arrange transportation services between motor carriers and shippers of various products." Milan Express Co., Inc. v. Western Surety Co., 886 F.2d 783, 784 (6th Cir. 1989). A broker is distinct from a carrier, who actually transports property by motor vehicle.

A "broker" is statutorily defined as "a person, other than a motor carrier . . . that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2).

7

subject to liability under the Carmack Amendment, they can be held liable under state common law tort or breach of contract theories. Chubb Group, 243 F. Supp. at 1069 (recognizing that "most courts hold that *brokers* may be held liable under state tort or contract law in connection with shipments") (emphasis added); see also Intercargo Ins. Co. v. Burlington N. Santa Fe R.R., 185 F. Supp. 2d 1103, 1113-1115 (C.D. Cal. 2001) (applying California law to party that was neither a carrier nor a freight forwarder); Prof'l Commc'ns, Inc. v. Contract Freighters, Inc., 171 F. Supp. 2d 546, 551-52 (D. Md. 2001) (applying Florida and Maryland law of negligence to a motor carrier broker).

Here, defendant's potential liability under the Carmack Amendment hinges upon whether it acted as a broker or a carrier in relation to the relevant shipment. Defendant argues that it acted as a property broker only, and therefore it is not liable for the cargo loss pursuant to the Carmack Amendment. Defendant argues that as the broker, it bears *no* responsibility for the cargo loss, but rather it is the carrier, Sonko, who bears the responsibility. Plaintiff argues there are numerous facts showing that defendant acted as a carrier, and said facts raise triable issues sufficient for it to withstand summary judgment.

In this case, the court finds there are factual disputes over whether Cheetah played the role of a broker or motor carrier in the shipment of the flat panel monitors. Such factual disputes preclude the granting of defendant's motion for summary judgment. See e.g. Consol. Freightways Corp. of Del. v. Travelers Ins. Co., 2003 WL 22159468 (N.D. Cal. Mar. 28, 2003) (precluding summary judgment because triable issues of fact

remained as to whether trade show producer who arranged shipment of participant's goods from trade show back home was a carrier or merely a broker); Hewlett-Packard Co. v. Brother's Trucking Enterprises, Inc., 373 F. Supp. 2d 1349, 1352 (S.D. Florida 2005) (precluding summary judgment on Carmack Amendment claim because reasonable fact finder could find that the defendant acted as either motor carrier or broker); Just Take Action, Inc. v. GST (Americas) Inc., 2005 WL 1080597 (D. Minn. May 6, 2005) (precluding summary judgment because triable issues of fact existed whether the defendant played "the role of broker or motor carrier in shipping the fermenter tanks").

Contrary to defendant's protestations, a carrier is not automatically considered a broker because it requests another carrier to perform the transportation. Rather,

> . . . motor carriers . . . are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport.

49 C.F.R. § 371.2(a). Furthermore, 49 C.F.R. § 371.7(b) states that "a broker shall not, directly or indirectly, represent its operations to be that of a carrier. Any advertising shall show the broker status of the operation." Here, KLS offers evidence that Cheetah is licensed by the Federal Motor Carrier Safety Administration as a carrier (DF ¶ 7), and that Cheetah's advertising does not state that Cheetah is a broker (DF ¶ 9). Additionally, KLS offers evidence that it intended that Cheetah would be the carrier of the shipment; Cheetah agreed to act as such; KLS believed Cheetah was transporting the shipment; and Cheetah remained KLS's sole point of contact at all relevant

9

times.  (DF ¶s 13, 14, 20, 24.)  Viewing this evidence in the light most favorable to plaintiff, a reasonable fact finder could find that Cheetah served as a "carrier" rather than a "broker," pertaining to the subject shipment, despite the fact that Cheetah ultimately arranged for Sonko to actually transport the shipment.

The court finds that based on the evidence outlined above, there is a genuine issue of material fact as to whether Cheetah acted as a broker or a motor carrier.  See e.g. Consol, Freightways Corp., 2003 WL 22159468 *6 (finding summary judgment inappropriate because the defendant performed some transportation functions that indicated it might be characterized as a "motor carrier" rather than a "broker").  Because a reasonable fact finder could decide that Cheetah served as a motor carrier rather than a broker, summary judgment of plaintiff's Carmack Amendment claim is DENIED.

**2.   State Law Claims**

**a.   Negligence [failure to provide adequate insurance]**[4]

In the event the Carmack Amendment does not attach liability to Cheetah as a broker, KLS, alternatively, alleges various state law claims against Cheetah, including a negligence claim based on a failure to provide KLS with adequate insurance.  Specifically, plaintiff contends that although KLS required that Cheetah have insurance in the amount of $250,000.00 and Cheetah provided an insurance certificate showing $250,000.00 of cargo coverage, "Cheetah concealed from KLS that Cheetah's policy had a $250,000

---

[4] Because they differ slightly from the complaint, the court notes in the parenthetical headings below, plaintiff's description of its claims as set forth in its opposition to the motion.  (Opp'n, filed July 13, 2007, at 4.)

10

deductible; in reality, Cheetah had no real insurance at all." (Opp'n at 11.) Cheetah, on the other hand, disputes that KLS informed it of the value of the load prior to the transportation, or that KLS requested any particular insurance coverage. Rather, Cheetah asserts that KLS is only *now* seeking to impose an insurance duty that did not exist prior to the time Cheetah undertook the shipment services.

To state a claim of negligence under California law, a plaintiff must demonstrate: 1) the defendant owed the plaintiff a legal duty; 2) the defendant beached that duty; and 3) the breach was a proximate or legal cause of injuries suffered by the plaintiff. Claxton v. Atlantic Richfield Co., 108 Cal. App. 4th 327, 335 (2003). In general, courts have held that a broker's duty to a shipper is limited to arranging for transportation with a reputable carrier. See Chubb Group, 243 F. Supp. 2d at 1071. Defendant asserts it met this obligation in this case. However, in so arguing and proffering evidence of the same, defendant ignores plaintiff's precise theory of negligence liability; plaintiff contends defendant undertook the obligation to provide plaintiff with adequate insurance covering the shipment. Whether defendant, in fact, undertook such obligation is disputed, and thus, summary judgment is denied as to this claim. See e.g. Just Take Action, 2005 WL 1080597 *5-6 (precluding summary judgment on negligence claim where the plaintiff hired the defendant to arrange for transportation of fermenter tanks with the understanding that the tanks would be shipped with full coverage).

11

        **b.**    **Breach of Contract [failure to transport shipment as agreed and failure to procure adequate insurance]**

Also in the event Cheetah is determined to be a broker, plaintiff asserts a state law breach of contract claim against Cheetah, arguing Cheetah breached their oral contract to transport the shipment itself and to provide adequate insurance coverage for the shipment. Cheetah does not contest it entered an oral contract with KLS to arrange transport of the monitors, but argues its contract with KLS did not include the responsibility of transporting the shipment or providing insurance coverage for the shipment.

An essential element of a contract is a definite and unequivocal agreement, or meeting of the minds, between the parties. The test of contractual formation is an objective one, to be judged by the words and actions of the parties and not by their subjective mental intent. Bustamante v. Intuit, Inc., 141 Cal. App. 4th 199, 208 (2006).

Here, the parties disagree as to the terms of their oral contract. Each side presents evidence in support of their respective, contrary positions. Such evidence from plaintiff suggests breach by defendant for failing to ship the monitors itself and providing effectively no insurance for the shipment, since the $250,000.00 insurance policy allegedly provided had a $250,000.00 deductible. Defendant, on the other hand, proffers evidence that KLS hired it to *arrange* for the transportation of the monitors and KLS knew Cheetah would "broker-out" the work. The court cannot resolve these factual disputes on a motion for summary judgment. See e.g. Just Take Action, 2005 WL 1080597 *6–

7 (declining to grant summary judgment on the plaintiff's breach of contract claim where the parties disagreed whether they believed the defendant would arrange for the transportation of the fermenter tanks or whether the defendant itself was responsible for the transportation). Sufficient evidence exists to create a material dispute as to the terms of the parties' contract, and thus, defendant's motion as to this claim must also be denied.

### c. Negligent Hiring [failure to hire motor carrier with adequate insurance]

Plaintiff contends that "when Cheetah, unknown to KLS, requested Sonko Trucking to transport the [shipment], Cheetah failed to ensure that Sonko had $250,000 insurance coverage as demanded by KLS of Cheetah." (Opp'n at 12.) Thus, assuming Cheetah was acting as a broker, plaintiff contends that Cheetah was negligent in hiring an improperly insured carrier. Defendant contends that it owed no duty to KLS to ensure that Sonko had insurance coverage of $250,000.00.

In general, courts have not imposed a legal duty on transportation brokers to hire carriers with specific insurance coverage. In Chubb Group, the court addressed whether a broker "has a legal duty to hire a carrier with adequate insurance." 243 F. Supp. 2d at 1072. In holding that brokers do not have such a duty, the court noted that, as in the present case,

> [p]laintiff cites no case law establishing or recognizing a duty on the part of a broker to ensure that its carrier has adequate insurance to cover potential losses or damages to the cargo. Moreover, this Court has been unable to locate any cases that are directly on point.

13

Chubb Group, 243 F. Supp. 2d at 1072.  In Chubb Group, the court recognized that to the extent courts have imposed this duty on brokers, the obligation arose from a contract; courts have not recognized a general tort duty to hire carriers with specified insurance coverage.  Id. (citing Government of the U.K. v. Northstar Services, Ltd., 1 F. Supp. 2d 521, 527 (D. Md. 1998)).

Here, unlike its negligence claim asserted against Cheetah directly, for alleged obligations Cheetah undertook on its own behalf as the carrier of the goods, plaintiff asserts in this claim that Cheetah agreed to ensure that any motor carrier Cheetah employed to transport the shipment would carry $250,000.00 in insurance coverage.  However, plaintiff proffers no evidence that it required Cheetah to employ any particular type of carrier.  Indeed, the gravamen of the complaint relates only to alleged requirements plaintiff made of *Cheetah* to transport the shipment.  Because the law does not impose a general duty on brokers to require carriers to hold adequate insurance and plaintiff has no evidence that Cheetah undertook such a specific duty in this case, the court grants defendant's motion as to this claim.[5]

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part.  Defendant's motion is granted as to plaintiff's negligent hiring claim, but

---

[5] Because some of plaintiff's substantive claims for relief survive, the court does not separately address plaintiff's claim for declaratory relief.  Should plaintiff prevail on one or more of its claims discussed above, it may also be entitled to a declaration of rights consistent with that other relief.

14

denied as to plaintiff's Carmack Amendment, negligence and breach of contract claims.

IT IS SO ORDERED.

DATED: August 23, 2007

FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE